AO 91 (Rev. 11/82)                                **CRIMINAL COMPLAINT**

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br>DANIEL FLINT | DOCKET NO.<br><br>MAGISTRATE'S CASE NO.<br>MJ 17-2532 |

FILED
CLERK, U.S. DISTRICT COURT
OCT 13 2017
CENTRAL DISTRICT OF CALIFORNIA
BY_____ DEPUTY

Complaint for violation of Title 49, United States Code, Sections 46314(a), (b)(2)

| NAME OF MAGISTRATE JUDGE<br>HONORABLE ALEXANDER F. MACKINNON | UNITED STATES MAGISTRATE JUDGE | LOCATION<br>Los Angeles, California |
|---|---|---|
| DATE OF OFFENSE<br>July 25, 2017 | PLACE OF OFFENSE<br>Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN) |

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

[49 U.S.C. §§ 46314(a), (b)(2)]

On or about July 25, 2017, in Los Angeles County, within the Central District of California, defendant DANIEL FLINT knowingly and willfully entered, in violation of security requirements prescribed under Title 49 United States Code Sections 44901, 44903(b) or (c), or 44906, an aircraft or an airport area that serves an air carrier, with the intent to evade security procedures and restrictions.

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE: N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>MICHAEL SIMON |
|---|---|
| | OFFICIAL TITLE<br>FBI Special Agent |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1) | DATE<br>October 13, 2017 |
|---|---|

(1) See Federal Rules of Criminal Procedure 3 and 54

AUSA Chelsea Norell ext. 2624     REC: Detention

**AFFIDAVIT**

I, Michael T. Simon, being duly sworn, declare and state as follows:

## I.  PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint against and arrest warrant for DANIEL FLINT, for a violation of Title 49, United States Code, Sections 46314(a) and (b)(2), Entering an Airport Area in Violation of Security Requirements.

2. The facts set forth in this affidavit are based on my personal observations, my training and experience, and information obtained from other law enforcement officers and witnesses. This affidavit is intended to show that there is probable cause for the requested arrest warrant and criminal complaint and does not purport to set forth all of my knowledge or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II.  BACKGROUND OF FBI SPECIAL AGENT MICHAEL T. SIMON

3. I have been employed as a Special Agent ("SA") of the Federal Bureau of Investigation ("FBI") since 2015. Since April 2017, I have been assigned to the FBI's Joint Terrorism Task

Force at the Los Angeles International Airport ("LAX"), where I investigate violations of federal law that occur within the airport environment and on board aircrafts. I also completed 22 weeks of training at the FBI Academy at Quantico, Virginia, where I received formal training in criminal investigative techniques.

### III.    SUMMARY OF PROBABLE CAUSE

4. On July 20, 2017, FLINT attempted to board a flight at Chicago O'Hare International Airport ("O'Hare") to LAX. FLINT told officers at the Transportation Security Administration (TSA) checkpoint that he was a diplomat, presented false diplomatic credentials, and said that he had a "diplomatic pouch" that was not subject to TSA screening. The TSA officer examined FLINT's documents and told FLINT that he did not have the appropriate identification to avoid full screening of the bag. A few hours later, FLINT went to Chicago Midway International Airport ("Midway") and again told TSA officers that he was a diplomat and again presented false credentials. FLINT was then able to proceed through the checkpoint without the alleged diplomatic pouch being screened, and boarded a flight to LAX via Minneapolis-Saint Paul International Airport ("MSP").

5. On July 25, 2017, FLINT again cleared the TSA checkpoint at Midway presenting false credentials and avoiding screening of his alleged diplomatic pouch. After FLINT was on board a flight bound to LAX, a supervisor realized that FLINT did not have the proper documentation in order to avoid screening, so the supervisor requested that TSA officers at LAX conduct a full reverse screening of FLINT upon his arrival at LAX. When FLINT was approached by TSA officers at LAX, FLINT told them that he was a diplomat and insisted that his alleged diplomatic pouch could not be screened. FLINT ultimately consented to a search of the alleged diplomatic pouch, which revealed approximately $148,145 in U.S. currency bound in sealed plastic bags. Further investigation revealed that FLINT did not have any diplomatic status and that the organization he purportedly worked for was not registered with or recognized by the State Department.

## IV. STATEMENT OF PROBABLE CAUSE

### A. Relevant law and regulations regarding the security screening process and diplomatic pouch exemption

6. Based on my training and experience, and information I learned from other law enforcement agents, investigators, and analysts, I know the following:

    a. Title 49, United States Code, Section 46314

3

states, in pertinent part:  "(a) A person may not knowingly and willfully enter, in violation of security requirements . . . an aircraft or an airport area . . . (b)(2) A person violating subsection (a) of this section with intent to evade security procedures or restrictions . . . shall be fined under Title 18, imprisoned for not more than 10 years, or both."

        b.   Title 49, United States Code, Section 44901 states, in pertinent part: "(a) The Under Secretary of Transportation for Security shall provide for the screening of all passengers and property, including United States mail, cargo, carry-on, and checked bagged, and other articles, that will be carried aboard a passenger aircraft operated by an air carrier or foreign air carrier in air transportation or intrastate air transportation.  In the case of flights and flight segments originating in the United States, the screening shall take place before boarding and shall be carried out by a Federal Government employee."  No person may board an aircraft "without submitting to the screening and inspection of his or her person and accessible property in accordance with the procedures being applied to access control to that area or aircraft."  49 C.F.R. § 1540.107.

        c.   There are some limited exemptions from airport

4

security screening procedures. According to U.S. State Department Note 12-306, properly designated diplomatic pouches "shall not be opened or detained" in an airport screening area. The same State Department Note explains that a diplomatic pouch is any properly identified and sealed package, pouch, envelope, bag, or other container that is used to transport official correspondence, documents, and other articles intended for official use between any of the following: (1) embassies, legations, consular posts, and the foreign official of any government; (2) the headquarters or any other office of a public international organization and its regional offices in the United States or in a foreign country; or (3) the foreign office of any country with full membership in a public international organization and its mission to that organization.

        d. U.S. Department of State Diplomatic Note 12-306, dated November 9, 2012, details specific guidance on transporting diplomatic pouches into, within, and from the United States via aircraft, and states in pertinent part: "All individuals designated by a foreign ministry/department, embassy, consular, post, or international organization as being either a diplomatic or non-professional diplomatic courier, must use a valid diplomatic passport to accompany properly designated

diplomatic pouches into, within, or from the United States."

   e. When a foreign embassy or consular post in the United States wishes to have a diplomatic or non-professional diplomatic courier, who is not accredited as a member of that foreign mission in the United States, accompany a diplomatic pouch on an aircraft, the courier must provide the airline/carrier with an original "courier letter," which includes the following:

   i. The document must be an original that is on appropriate letterhead and bears the seal of the sending entity;

   ii. The document must list the name of the diplomatic or non-professional diplomatic courier who is accompanying the transport of the diplomatic pouch, and clearly identify him/her as a diplomatic or non-professional diplomatic courier;

   iii. The document must list the diplomatic passport number assigned to the courier;

   iv. The document must contain information that sufficiently identifies the diplomatic pouch(es) being escorted and state the quantity and total approximate weight of the properly designated diplomatic pouches that the representative is responsible for delivering to the carrier; and

   v. The document must be signed by a member of the

sending embassy or consular post who is accredited to the United States as a diplomatic agent or consular officer, and include their telephone number, job title, and their Department of State-issued personal identification number.  When a courier uses a courier letter to accompany a diplomatic pouch, the courier must present the airline/carrier with his or her valid diplomatic passport.

    f. Such couriers must also be prepared to present the courier letter described above and their valid diplomatic passport to any government authority responsible for transportation security or customs processing, to include such representatives stationed at security screening checkpoints.

  B. **FLINT's July 20, 2017 Attempt to Avoid TSA Screening at O'Hare Airport**

  7. Based on my review of reports of interviews with TSA officers at O'Hare Airport in Chicago regarding their interaction with FLINT on July 20, 2017, I know the following:

    a. On July 20, 2017, at approximately 2 p.m., FLINT entered the TSA PreCheck lane at O'Hare Airport, identified himself as a diplomat, and provided TSA Supervisory Transportation Security Officer (TSO) Christopher Kotula with a diplomatic identification card that said "International Human Rights Commission," had FLINT's name on it, and was stamped in

red capital letters with the word "DIPLOMAT." FLINT also presented a letter that said FLINT was acting as a diplomatic courier for the International Human Rights Commission ("IHRC"), and was carrying a diplomatic pouch on behalf of IHRC ("the Letter"). The Letter stated, "Pursuant to Articles 27.3 through 27.6 of the Vienna Convention on Diplomatic Relations (VCDR), you shall not be detained or abated in any way and the contents of your bag may not be seized or forfeited. As Designated Courier Agent of this Office, you shall be allowed to freely carryout your assignment on behalf of the International Human Rights Commission." Relying on the putative authority of the Letter, FLINT told Kotula that FLINT's alleged diplomatic pouch could not be screened.

   b. Kotula had encountered several diplomats at the screening checkpoint at O'Hare Airport and knew that diplomats always provided diplomatic passports, not diplomatic identification cards. Based on Kotula's training and experience, the alleged diplomatic identification that FLINT presented appeared to be printed from a home printer and was poorly laminated.

   c. The alleged diplomatic pouch had a small plastic window and a card inside the window reading "Diplomatic Pouch"

8

in what appeared to be spray paint. The pouch was secured with a simple lock on the zipper, sealed with wax.

  d. Kotula explained to FLINT that he did not meet the requirements to exempt the alleged diplomatic pouch from screening because he did not present a diplomatic passport. FLINT became argumentative and said he did not have a diplomatic passport, but that he was a lawyer and that he had flown with diplomatic pouches numerous times before and had never been stopped. Eventually, FLINT said he would call his ambassador to see if the ambassador would permit the alleged diplomatic pouch to be screened, but FLINT said he was not able to reach the ambassador. Kotula told FLINT if he could get permission, he could come back and board a flight as long as the alleged diplomatic pouch was screened. FLINT did not return.

  e. O'Hare Airport then issued a "Be on the Lookout" notice ("BOLO") for FLINT, which included his name and photograph, in light of his efforts to evade security screening procedures with documents suspected to be fraudulent. The BOLO was disseminated to Midway.

**C. FLINT's July 20, 2017 Evasion of Airport Security Screening Requirements**

 8. Based on my participation in an FBI interview of TSA Supervisory TSO Clay Yoksas, I know the following:

9

   a. On July 20, 2017, between 5 p.m. and 6 p.m., FLINT presented to Yoksas an alleged diplomatic identification card that was the same or substantially similar to the one he used at O'Hare. Yoksas asked FLINT for other identification and FLINT presented a Michigan driver's license, which matched the name on the alleged diplomatic ID card. FLINT also presented Yoksas with a courier letter that had FLINT's name on it and said that FLINT was traveling through Midway on July 20, 2017 for IHRC as a Designated Diplomatic Courier Agent. The letter listed a diplomatic pouch number and had an embossed notary seal. After Yoksas confirmed that the number on the alleged diplomatic pouch matched the number on the letter, Yoksas permitted FLINT to pass through the checkpoint without screening the pouch.

  **D. FLINT's July 25, 2017 Evasion of Airport Security Screening Requirements**

  9. Based on my review of an August 3, 2017 interview of Midway TSA Manager Raja Wondrasek, and my own interview with FLINT on July 25, 2017, I know the following:

   a. On July 25, 2017, FLINT entered the TSA checkpoint at Midway. He was flying Delta Airlines flight 5716 from Midway to MSP, and on a connecting flight on Delta Airlines from MSP to LAX. At the security checkpoint, FLINT presented

Wondrasek with an alleged diplomatic ID card that was the same or substantially similar to the one(s) he used at O'Hare and Midway five days earlier. He also presented a courier letter that said FLINT was acting as a diplomatic courier for the IHRC, and was carrying a diplomatic pouch on behalf of the IHRC.

    b. Wondrasek asked FLINT if he was the courier for the alleged diplomatic pouch and FLINT said, "Yes." Wondrasek said that on the side of the pouch was a clear plastic window that had a white card and the words "diplomatic pouch" written on the card. Underneath the card, Wondrasek said there was a diplomatic pouch number. Wondrasek matched the diplomatic pouch number on the pouch to the diplomatic pouch number in the courier letter.

    c. Based on the alleged diplomatic ID card and the diplomatic courier letter with the diplomatic pouch number, FLINT was permitted to pass through the checkpoint without having the alleged diplomatic pouch screened.

### E. FLINT Is Apprehended in Los Angeles and the Alleged Diplomatic Pouch Is Subject to a Reverse Screening Revealing Suspected Contraband

10. Based on my review of emails and reports from TSA at Midway, I know the following:

    a. FLINT boarded Delta flight 5716, from Midway to

11

MSP, and then boarded Delta Airlines flight 1358, from MSP to LAX.

  b. At approximately 12:15 p.m. Central Daylight Time (CDT), a Transportation Security Manager at Midway reviewed closed circuit television footage of FLINT's screening earlier that morning and verified that FLINT was the same individual from the BOLO who had attempted to circumvent screening on July 20, 2017 at O'Hare.

  c. At approximately 12:30 p.m. CDT, Midway TSA called Delta Airlines to confirm that FLINT was on flight 1358 to LAX. Midway Federal Security Director ("FSD") Kevin McCarthy then called the Deputy FSD at LAX, Martin Elam, at approximately 12:37 p.m. and requested that TSA reverse screen the alleged diplomatic pouch at LAX, given that FLINT had improperly circumvented screening procedures at Midway.[1] Elam confirmed that FBI and TSA would meet the flight and complete a reverse screening of the alleged diplomatic pouch.

  d. At approximately 12:45 p.m. CDT, FLINT's flight

---

[1] A de-planing passenger is subject to a reverse screening if he or she circumvents screening procedures in the embarking airport, because federal regulations prohibit a person from entering the secured area in the disembarking airport without submitting to the screening procedures being used to control access to that area. See 49 C.F.R. §§ 1542,103(6), 1540.107.

12

arrive and FBI and TSA personnel escorted FLINT to a screening checkpoint.

11. In the screening checkpoint area, TFO Wesley Williams and FBI SA Rebecca Marriott interviewed FLINT. Based on my review of the interview, I know that FLINT said the following:

   a. FLINT said that traveled to LAX that day in his capacity as an IHRC diplomat.

   b. FLINT said that he is an attorney and works for the Hampton Law Group and currently represents Robert Shumake, who FLINT claimed is an United States Ambassador for the IHRC.

   c. FLINT said that he became a diplomat by taking an oath administered by Mr. Shumake and added, "to the best of my knowledge, there is nothing that is illegal. There is nothing that is not above board. And it's all, all legitimate."

   d. FLINT said that he laminated the alleged diplomatic ID card himself so it would not get damaged. The alleged diplomatic ID card was purportedly valid until December 10, 2017, indicated that FLINT was Legal Counsel and a Diplomatic Courier for IHRC, and stated his ID card number was passport number #432641749. FLINT also presented a binder containing other IHRC-related documents and a diplomatic pouch.

   e. FLINT said that, as a diplomat, he had certain

rights, such as an exemption for the screening of his diplomatic pouch. He said that the contents of the diplomatic pouch belonged to Ambassador Shumake, and that the alleged diplomatic pouch contained money, but that he could not give any other specifics, because it was attorney-client privileged information.

12. When TFO Williams explained that TSA screeners would have to screen the alleged diplomatic pouch because the State Department did not recognized FLINT as a diplomat, FLINT asked to obtain consent from Shumake for the screening. FLINT called on speaker phone an individual who identified himself as Shumake, and Shumake refused to consent to the screening. Then Shumake called back a few minutes later and gave FLINT permission to open the bag. FLINT retrieved a key from his carry-on bag and gave it SA Marriott to open the bag.

13. The bag contained approximately $148,145.00 in U.S. currency. FLINT refused to explain the purpose or origin of the money.

14. After the interview, FBI SA Wess Brooker called the Drug Enforcement Administration (DEA) at LAX. DEA SAs arrived and brought a drug canine to conduct a screening of the alleged diplomatic pouch. The DEA canine alerted to drug residue on the

pouch. Pursuant to DEA forfeiture authority, Title 21, United States Code, Section 881 (a)(6), the DEA SAs seized the alleged diplomatic pouch and U.S. Currency.

### F. Follow Up Investigation Reveals that FLINT's Diplomatic Papers Are Fraudulent

15. Based on my review of the US Department of State's reports, dated July 25, 2017 and August 23, 2017, I know the following:

    a. FLINT has no diplomatic status filed with the Department of State's Office of Foreign Missions ("OFM").[2]

    b. The IHRC is not a recognized diplomatic organization within the United States.

    c. Robert Shumake is not recognized as an ambassador for any organization.

16. Based on my review of the U.S. Department of State's Consolidated Consular Database on October 11, 2017, I know that FLINT's United States Passport #432641749 was listed as stolen on April 12, 2017. In addition, Passport #432641749 is designated "General" and not "Diplomatic."

//

---

[2] According to the U.S. Department of State Foreign Affairs Manual, Section 232.4, the OFM is the only Department of State entity authorized to accept the accreditation of all other foreign representatives in the United States.

15

## V. CONCLUSION

17. Based on the foregoing, there is probable cause to believe that DANIEL FLINT has committed a violation of Title 49, United Sections 46314(a) and (b)(2), by knowingly and willfully entering, in violation of security requirements, the secure areas of LAX on July 25, 2017, with the intent to evade security procedures or restrictions.

*Michael T. Simon*
Michael T. Simon
Special Agent, FBI

Sworn and subscribed to before me this 13th day of October 2017

_____
UNITED STATES MAGISTRATE JUDGE
**ALEXANDER F. MacKINNON**